**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RONALD NEWMAN
1200 N. Capitol Street, N.W.
Apartment C111
Washington, D.C. 20002

Plaintiff,

v.

BORDERS, INC.
100 Phoenix Drive
Ann Arbor, MI 48108

and

BORDERS GROUP, INC.
100 Phoenix Drive
Ann Arbor, MI 48108

Defendants.

Civil Action No. ___________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

**NATURE OF ACTION**

1. Ronald Newman ("Plaintiff") is an African-American citizen of the United States and resident of Washington, D.C. He brings this action to redress injuries he has suffered and continues to suffer as a result of Defendants' racially discriminatory actions at the Borders bookstore located on Fourteenth Street in the downtown area of Washington, D.C. ("Borders"). Borders is operated by Defendant Borders, Inc., which is a subsidiary of Defendant Borders Group, Inc.

2. On Friday, December 2, 2005, Borders discriminated against Mr. Newman because of his race when it provided him with service that was hostile and objectively unreasonable, impeded his ability to purchase a book he had selected as a gift for his nephew, and ultimately prevented him from purchasing the book. Specifically, Borders (a) subjected Mr. Newman to surveillance as soon as he entered the store; (b) falsely, intentionally, and publicly accused Mr. Newman of stealing merchandise after he selected a book for purchase; (c) prevented Mr. Newman from purchasing merchandise; (d) lied to Mr. Newman about the existence of a videotape that purportedly showed him stealing; (e) failed to clear Mr. Newman of wrongdoing and tell him he could continue shopping or leave the store even after he demonstrated his innocence; and (f) finally required Mr. Newman to leave the store before the arrival of the police, whom Mr. Newman had summoned to ensure he was cleared of any allegations of wrongdoing. Borders undertook the foregoing actions because Mr. Newman is African-American. White customers in the store were not subjected to the same treatment.

3. By their actions, Defendants denied Plaintiff the right to make and enforce a contract on the same basis as white citizens in violation of 42 U.S.C. § 1981 and negligently supervised their employees in violation of District of Columbia common law.

4. On the basis of the violations asserted herein, Mr. Newman seeks compensatory and punitive damages, a declaratory judgment, and an injunction directing Defendants to desist from and remedy their discriminatory conduct.

**PARTIES**

5. Plaintiff Ronald Newman is an African-American citizen of the United States. He is employed as a teacher and administrator at the Duke Ellington School of the Arts, a public high school in Washington, D.C. At all times relevant to this Complaint, Mr. Newman was a resident of Washington, D.C.

6. Upon information and belief, Defendant Borders, Inc. is a Michigan corporation that is in the business of operating book, music and movie stores throughout the world. At all times relevant to this complaint, Borders, Inc. operated at least three stores in the District of Columbia, including the Borders store located at 600 14th Street, N.W., Washington, D.C., and more than a dozen other stores in the greater Washington, D.C. metropolitan area. At all times relevant to this complaint, Borders, Inc. maintained either actual or constructive control, oversight, responsibility, and/or direction over the operation of the Borders store on Fourteenth Street, N.W., including all policies and practices related to management, personnel, operations, and customer service, as well as the discriminatory policies and practices complained of herein.

7. Upon information and belief, Defendant Borders Group, Inc. is a Michigan corporation that is in the business of operating book, music, and movie stores throughout the world through its subsidiaries, including Defendant Borders, Inc. At all times relevant to this complaint, Borders Group, Inc. exercised either actual or constructive control, oversight, and/or direction over the operation of Borders, Inc. and the Borders store on Fourteenth Street, N.W., including all policies and practices related to management, personnel, operations, and customer service. Borders Group, Inc. exercises direct control over Borders, Inc. such that their

relationship is one of principal and agent. As the owner and principal of Borders, Inc., Borders Group, Inc. is liable for the discriminatory policies and practices complained of herein.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(4), and 28 U.S.C. § 1367.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in the District of Columbia.

**FACTUAL BACKGROUND**

10. On the evening of Friday, December 2, 2005, Ronald Newman went to Borders to buy a book as a gift for his nephew. Mr. Newman was accompanied by his friend Clifton Walker, III. Like Mr. Newman, Mr. Walker is an African-American resident of the District of Columbia and a teacher in the District of Columbia.

11. There was nothing unusual about how Mr. Newman and Mr. Walker appeared or acted. They were dressed in casual clothing and spoke to each other in normal tones. Mr. Newman carried a plastic shopping bag from Urban Outfitters, where he and Mr. Walker shopped before coming to Borders.

12. Mr. Newman and Mr. Walker entered the store through its main entrance on the corner of 14th and F Streets. They immediately walked downstairs together to the music department. Like many customers, they spent five to ten minutes browsing and listening to music through headphones provided by Borders.

13. Mr. Newman and Mr. Walker then proceeded together to the children's department. Mr. Walker recommended a particular book called "Rainbow Fish." They looked

for it together but could not find it. Mr. Newman selected a different book that he intended to purchase for his nephew.

14. Mr. Newman and Mr. Walker then walked together back through the music department toward the escalator that leads to the main floor of the store. Mr. Newman was going upstairs to the cash registers so that he could buy the book, which he was carrying in plain view. Mr. Walker stopped at a computer near the escalator to search for an item he was interested in.

15. Just before Mr. Newman reached the escalator, a woman stepped directly in front of him. She deliberately blocked his path and physically prevented him from continuing upstairs. Her clothing was in poor condition and did not clearly indicate that she was a Borders employee or a security guard. She did not identify herself. She initiated a confrontation with Mr. Newman in a public area of the store and in plain view and earshot of other customers and Mr. Walker. The woman was later identified as security guard Darlene White.

16. In an aggressive and hostile manner, Ms. White told Mr. Newman that she saw him place store merchandise in his Urban Outfitters bag, accused him of shoplifting, and demanded to see his bag. Upon information and belief, by confronting Mr. Newman, Ms. White violated store policy regarding how employees are required to respond to suspected shoplifters.

17. Mr. Newman did not know the identity of the person confronting him and was shocked by her accusation. He therefore did not comply with Ms. White's demand to see his bag. Ms. White repeated her accusation, and Mr. Newman said, "Excuse me?" Ms. White persisted in accusing Mr. Newman of shoplifting, and he finally told her sharply to get out of his way. Ms. White continued to block Mr. Newman's path and accuse him of shoplifting.

18. Because Ms. White still had not identified herself, Mr. Newman asked her who she was and whether she worked for Borders. Ms. White said that she was a Borders security guard. Mr. Newman asked two employees who were watching from a customer service desk next to the escalator if this were true. The employees confirmed that Ms. White was a Borders security guard.

19. During this confrontation, Ms. White told Mr. Newman that she had been watching him since he entered the store. She also indicated that a security videotape showed Mr. Newman placing store merchandise in his bag. Ms. White's statements notwithstanding, there was no legitimate basis for Borders to target Mr. Newman when he entered the store or at any time thereafter. Mr. Newman had not done anything to attract the attention of a security guard and the allegation that he put something in his bag was false. Mr. Newman concluded from Ms. White's admission that she had been watching him from the time he entered the store that the real reason for the accusation of stealing was his race.

20. Mr. Newman promptly asked to see the store manager, and one of the employees at the customer service desk requested the manager's presence. The manager, Pat Spurlock, did not arrive for five to ten minutes. Ms. White and the employees from the customer service desk remained with Mr. Newman during this time. Mr. Newman did not feel that he was free to leave. Several customers were also watching.

21. When Ms. Spurlock finally arrived, Mr. Newman told her that the security guard had told him that a videotape showed him stealing and that he had store merchandise in his bag. Mr. Newman told Mr. Spurlock that he wanted to see the videotape and emptied his bag on the customer service desk. The bag did not contain any Borders merchandise. The only item in the

bag was a small bottle of perfume from Urban Outfitters. Nonetheless, and without any basis, Ms. White continued to insist that Mr. Newman was a criminal, arguing that Mr. Newman must have returned the merchandise to the shelf.

22. Ms. Spurlock, like Ms. White, disregarded the proof of Mr. Newman's innocence. She failed to acknowledge Ms. White's error, apologize, tell Mr. Newman that he was free to continue shopping or leave, or indicate in any other way that Mr. Newman was no longer under suspicion. Ms. Spurlock and Ms. White whispered to each other and then walked away together. Mr. Newman believed that they were going to view the videotape from store surveillance cameras.

23. Before Ms. Spurlock and Ms. White left to view the tape, Mr. Newman asked Ms. Spurlock if it was store policy to call the police when employees believe that someone is stealing. Ms. Spurlock did not respond to the question before walking away. While waiting for Ms. Spurlock to return, Mr. Newman decided to call the police from a telephone at the customer service desk. He described the situation to the dispatcher and said that he did not know what to do. The police told Mr. Newman that an officer would be dispatched to the store. Mr. Newman called the police because he feared that Borders would refuse to clear him and would persist in accusing him of shoplifting despite the proof of his innocence. Mr. Newman believed that, if the police could assess the situation, they would confirm his innocence and give him permission to leave the store.

24. Mr. Newman and Mr. Walker waited patiently for Ms. Spurlock to return. During this time, one of the employees from the customer service desk remained with Mr. Newman and Mr. Walker. Other customers were still watching. Mr. Newman did not feel free to leave.

25. Ms. Spurlock eventually returned by herself. Upon information and belief, she had now viewed the store's surveillance videotape, knew that it was not incriminating, and knew that Mr. Newman was innocent. Ms. Spurlock nonetheless still did not clear Mr. Newman or acknowledge his innocence in any way.

26. Mr. Newman repeated his request to view the security tape. Ms. Spurlock refused. She was evasive and disingenuous, claiming that she did not have access to the tape, and then changing her story and claiming that store policy did not permit her to show it to a customer. Ms. Spurlock similarly refused to discuss with Mr. Newman what she had seen on the security tape.

27. Mr. Newman told Ms. Spurlock that he believed he was the victim of racial profiling by Borders. Unable to obtain any type of indication from Borders that he was no longer under suspicion and otherwise free to go, and reasonably fearing Borders would order him stopped by authorities if he tried to leave the store, Mr. Newman asked Ms. Spurlock what he was supposed to do. Ms. Spurlock responded with callous indifference, stating words to the effect of: "What do you want me to do? I have a store to run."

28. After uttering these words, Ms. Spurlock abruptly departed, leaving Mr. Newman standing at the base of the escalator. Mr. Newman believed he was not free to go, or to resume shopping. He had been left with the plain understanding that he was not a welcome customer; to the contrary, Ms. Spurlock's actions made clear that Borders still considered him a thief. Like any reasonable person under these circumstances, Mr. Newman felt it imperative that he be cleared by a person of authority. Accordingly, Mr. Newman and Mr. Walker concluded they had no choice but to wait for the police to arrive.

29. Mr. Newman and Mr. Walker proceeded up the escalator to the main floor to wait for the police in the foyer at the front of the store. After approximately twenty minutes, Ms. Spurlock told them that the store was closing and instructed them to leave against their will even though she knew they were waiting for the police. They obeyed her command and left.

30. Approximately one hour elapsed between the time when Ms. White first blocked Mr. Newman's path to the register and accused him of shoplifting and the time when Ms. Spurlock told him to leave the store. During the entirety of that time, Borders never cleared Mr. Newman of suspicion and never permitted him to resume his normal activities in the store. Borders thereby prevented Mr. Newman from purchasing the book he chose for his nephew.

31. Upon information and belief, throughout the stop of Mr. Newman, Ms. Spurlock knew that Ms. White had acted contrary to store policy regarding suspected shoplifting. Ms. Spurlock violated that policy by failing to end Borders's confrontation with Mr. Newman immediately and allow him to make his purchase unimpeded. Ms. Spurlock's violations of company policy compounded and ratified Ms. White's policy violations.

32. Outside the store, Mr. Newman waved down a police car. He explained to the officers what Borders had done. The officers suggested that he contact an attorney.

33. Mr. Newman would like to shop at Borders in the future provided that appropriate measures are taken to remedy the discriminatory treatment of African-American customers.

**DISCRIMINATORY POLICIES**

34. Borders's decision to surveil Mr. Newman as soon as he entered the store, accuse him of theft, prevent him from purchasing merchandise, and evict him from the store was undertaken based on the belief that Plaintiff posed a risk of shoplifting because of his race and

the color of his skin. Borders's conduct was motivated by the stereotyped belief that African-Americans are more likely to steal merchandise than whites. The conduct engaged in by Defendants and their employees, agents, and/or representatives as described above denied Plaintiff the right to make and enforce a contract on the same basis as white customers.

35. At all times relevant to the events described above, the manager, security guard, and other employees of Borders were acting within the scope of their employment as employees, agents, and/or representatives of the Defendants. The discriminatory practices described above were carried out: (a) at the direction of and with the consent, encouragement, knowledge, and ratification of the Defendants; (b) under the Defendants' authority, control, and supervision; and/or (c) within the scope of the employees' employment.

36. Through the actions of its employees, agents, and/or representatives described above, Defendants Borders, Inc. and Borders Group, Inc. acted intentionally, maliciously, and with willful, callous, wanton, and reckless disregard for Plaintiff's federally and locally protected rights.

**INJURY TO PLAINTIFF**

37. As a direct and proximate result of Defendants' discriminatory policies and practices, the Plaintiff has suffered, and in the future will continue to suffer, economic loss, humiliation, embarrassment, and mental and emotional distress.

38. Defendants' discriminatory actions have made Mr. Newman fearful of being targeted for racial profiling in other commercial establishments.

39. Mr. Newman's injuries were significantly exacerbated by the public nature of Defendants' humiliating accusations and treatment.

**COUNT I**

**(Violation of 42 U.S.C. § 1981)**

40. The Plaintiff realleges and incorporates by reference all of the allegations set forth in paragraphs 1 through 39 above.

41. The foregoing actions by Defendants constitute a deprivation of the right of Plaintiff to make and enforce contracts on the same terms enjoyed by white persons, in violation of 42 U.S.C. § 1981.

**COUNT II**

**(Negligent Supervision)**

42. The Plaintiff realleges and incorporates by reference all of the allegations set forth in paragraphs 1 through 41 above.

43. The foregoing actions of Defendants constitute negligent supervision. Defendants knew or should have known that Ms. Spurlock and/or Ms. White behaved in a dangerous or otherwise incompetent manner and nonetheless failed to adequately supervise them.

**PRAYER FOR RELIEF**

44. WHEREFORE, Plaintiff prays that this Court grant him the following relief:

(a) enter a declaratory judgment finding that the foregoing actions of the Defendants violate 42 U.S.C. § 1981 and the common law prohibition against negligent supervision;

(b) enter a permanent injunction directing the Defendants and their directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

(c) award compensatory damages in an amount to be determined by the jury that would fully compensate Plaintiff for the economic loss, humiliation, embarrassment, and mental and emotional distress caused by the conduct of the Defendants alleged herein;

(d) award punitive damages to the Plaintiff in an amount to be determined by the jury that would punish the Defendants for their willful, wanton, and reckless conduct alleged herein and that would effectively deter the Defendants from engaging in similar conduct in the future;

(e) award Plaintiff his reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

(f) order such other relief as this Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiff requests trial by jury as to all issues in this case.

Date: March 14, 2007

Respectfully submitted,

John P. Relman (D.C. Bar No. 405500)
Glenn Schlactus (D.C. Bar No. 475950)
RELMAN & DANE PLLC
1225 19th Street, N.W.
Suite 600
Washington, D.C. 20036
(202) 728-1888 (o)
(202) 728-0848 (fax)

*Attorneys for Plaintiff*

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Ronald Newman<br>(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF 11001<br>(EXCEPT IN U.S. PLAINTIFF CASES) | Borders, Inc. and Borders Group, Inc.<br>COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ________<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br>John Relman and Glenn Schlactus; Relman & Dane; 1225 19th St. NW Suite 600; Washington, DC 20036 (202) 728 1888 | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☑ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES

(PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

### ☐ A. *Antitrust*

- ☐ 410 Antitrust

### ☐ B. *Personal Injury/ Malpractice*

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

### ☐ C. *Administrative Agency Review*

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ☐ D. *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ☐ E. *General Civil (Other)* OR ☐ F. *Pro Se General Civil*

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ G. *Habeas Corpus/ 2255* | ☐ H. *Employment Discrimination* | ☐ I. *FOIA/PRIVACY ACT* | ☐ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
| ☐ K. *Labor/ERISA (non-employment)* | ☑ L. *Other Civil Rights (non-employment)* | ☐ M. *Contract* | ☐ N. *Three-Judge Court* |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☑ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☑ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ Multi district Litigation ☐ 7Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 U.S.C. § 1981 - Defendants depraved Plaintiff, an African-American, of the right to make and enforce contracts on the same terms enjoyed by white persons.

**VII. REQUESTED IN COMPLAINT** CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 **DEMAND $** To be determined by Jury Check YES only if demanded in complaint **JURY DEMAND:** ☑ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instruction) ☐ YES ☑ NO If yes, please complete related case form.

**DATE** 3/14/07 **SIGNATURE OF ATTORNEY OF RECORD** [signature]

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.